## Randall v. Randall.

November 29, 1949.

Rehearing denied February 2, 1950.

R. C. Tarter, Judge.

Sandusky & Krueger for appellant.

H. C. Kennedy for appellee.

JUDGE HELM—Reversing.

On September 17, 1947, appellant filed a petition against appellee seeking a divorce from him on account of cruel and inhuman treatment, and a confirmed habit of drunkenness of not less than one year's duration, accompanied by the wasting of his estate. She filed an amended petition on September 21, 1947. She seeks a divorce, alimony, and "that each be restored to all of their property rights," and her costs, including a reasonable attorneys' fee. Appellee filed answer and counterclaim, seeking a divorce on the ground of her cruel and inhuman treatment, and "such lewd and lascivious conduct as indicates that she is unchaste."

The trial court granted appellee a divorce and granted appellant alimony in the sum of $30 a month, beginning in July, 1948, and until the further orders of the court, and granted her attorneys $100 for their services, to be paid by the defendant to her attorneys. She prayed an appeal, which was granted. He prayed an appeal from that part of the judgment allowing her $30 per month alimony.

Appellant, 31 years of age, married appellee April 5, 1941. He is 49 years of age and is paralyzed on his left side. At the time of the marriage, she had an illegitimate child, about which he knew before they were married. She separated from him about September 15, 1947. She gives as cause of the separation that "it was his drinking and cruel treatment."

Summarizing the testimony for her: He drank a lot; would take it by spells; he would cuss and fight her; strike her, struck her many times, most of the time when he would be drinking; would call her a "bitch" and an "old whore;" he would strike her with his walking cane; they would fuss; she started some, but it would be when he would be drinking; he threatened to cut her; he had a pistol which she would hide when he got drunk because she was afraid he would shoot her; his conduct was such that she had to stay away from home "a lot of nights;" she would go back home when he would sober up; he struck her with a flashlight.

At the time they were married, they had very little property. At the time they separated, she says that his property consisted of 10 acres of land at Burdine Valley, most of it tillable, and another tract of three or four acres on the Mark Road. On the 10-acre tract there was a residence, a store, a restaurant, a garage, and an oil station. They had a stock of groceries, fixtures in the store and restaurant, automobile parts, supplies for the restaurant, gas in the tank, and other personal property, all of which she values at $10,000. Appellee had given appellant an automobile; the bill of sale was in her name. The trial court adjudged that the automobile is the property of appellant. She worked to help accumulate this property; she "sold gas, worked in the restaurant and the store, * * * there wasn't anything I wouldn't do." On account of his crippled condition,

she waited on her husband—"shaved him, washed him when he cleaned up, put his clothes on him," and washed his clothes. She waited on him "while he was drunk, sick, and in the bed." In addition to working in the restaurant and in the store and waiting on him, she kept house, cooked, washed and ironed. She did not drink. They had no children. Her boy, 12 years of age, lived with them.

At times they employed others to assist them in their business. Some months before they separated, appellee employed Matt Awall at the garage on a commission basis. He worked on the cars, in the restaurant, and anything there was to do. He would drive the car for both appellee and appellant, who could not drive, on trips they would make for supplies and other purposes. She went to the show with Awall twice but other people were along. One time her "little boy was along." There was never anything immoral between her and Awall. Usually, she and her husband slept at the store. On three occasions she slept at the house when Awall had a room there, but her son also slept there. One night appellee's niece also slept there.

Summarizing the testimony for appellee: He is engaged in the grocery, restaurant, oil station and parts business in Pulaski County. He had lived at his present location about four years. They would fuss at times, "if he took a drink of whisky or anything like that. She was a fanatic." He has drunk some whisky; "a gallon before I married" to a "pint since I married." The doctors advised him to drink some whisky on account of his paralyzed condition. He has struck appellant. Appellant waited on him; "She was a good worker, * * * She worked good at the store and at the house, kept the house clean, washed and ironed, cooked, worked in the restaurant and grocery store, * * * helped to make what was out there * * * she helped all the time." Awall went to work with him on a commission basis. He also "hung around in the restaurant with Treva and the hired girl." He saw Awall and his wife "grin at each other a number of times;" he "thought there was something wrong between her and Awall." His wife usually slept with him at the store; a few times she slept at the house where Awall had a room. Awall is a man 35 or 40 years of age.

Tom Price, a deputy sheriff, says he saw appellant and Awall sitting together at a picture show in Somerset. He followed them in to see what they did; "Treva had her arm around him." He followed her to a restaurant "watching that wild man—Awall." Opal Price says appellant asked her where she could stay in town with Awall. Opal admitted having been to the House of Reform. Faustine Mayfield Ping says appellant told her she "liked Awall's appearance;" she dated Awall one Sunday afternoon "to find out the score" between him and appellant; she learned that he liked appellant very much. Lella Vic Randall, niece of appellee, slept in her uncle's dwelling one night; Awall, appellant and her son also slept there; she heard appellant and Awall talking; it "seemed to me she was in Awall's room." Appellee became jealous of his wife. Appellant denies the accusations made against her by appellee's witnesses. Orville Burdine says that he "heard her say that when her and Sherman's law suit was over, her and Matt were going to travel."

Appellee stated that the real estate where he lives is not worth over $2,000; that the stock of goods was worth around $600. He does not state the value of other personal property, such as deep freeze, cooler, refrigerator, furniture, cow, crops, automobile parts, tools, automobile, gas in tank, or accounts. From the evidence, it is difficult to tell the amount and value of the property jointly accumulated by appellant and appellee. From the testimony, it was, we believe, at least $2,000.

Neither appellant nor appellee was without fault. Appellee's counsel, in his brief, says, "When it comes to the question of cruelty, the honors were just about even." Notwithstanding this, the trial court granted appellee a divorce. We are not authorized to change that part of the judgment. Appellee frankly admits that his wife, during the years they were married, was a good worker. From the evidence, we believe that their property was accumulated by their joint efforts, and that she is entitled to at least $1,000 as her part of this accumulated property. Appellee has not prosecuted a cross appeal. He should be credited with any amounts he may have paid her as alimony. See, Keeling v. Keeling, 299 Ky. 540, 186 S. W. 2d 18.

The judgment of the circuit court is reversed with directions for the entry of a judgment in accordance with this opinion.